362 F.2d 736
 DIAPULSE CORPORATION OF AMERICA, Bessie Ginsberg, as Executrix under the Last Will and Testament of Abraham J. Ginsberg, deceased, Jesse Ross, William F. Kelly, Jr., Bernard O. Siler, Irving Grad and Joseph Ross, Plaintiffs-Appellees,
v.
The BIRTCHER CORPORATION, Defendant-Appellant, and
Cecil J. Birtcher, Defendant.
 No. 350.
 Docket 29520.
 United States Court of Appeals Second Circuit.
 Argued April 26, 1966.
 Decided June 20, 1966.
 Certiorari Dismissed September 1, 1966.
 
 See 87 S.Ct. 9.
 COPYRIGHT MATERIAL OMITTED Richard D. Furlong, Freeport, N. Y. (Freedman, Weisbein & Furlong, Freeport, N. Y., on the brief), for plaintiffs-appellees.
 Thomas H. McManus, New York City (Lynch & McManus, New York City, on the brief), for defendant-appellant.
 Before SMITH, KAUFMAN and FEINBERG, Circuit Judges.
 KAUFMAN, Circuit Judge:
 
 
 1
 An inevitable concomitant of our highly competitive private enterprise system is that businessmen engage in "puffing" their products, while they attempt to downgrade those of their competitors. Ordinarily, the law tries to maintain a position of neutrality toward the techniques of exaggerated salesmanship which have become commonplace today. But when these tactics begin to exceed reasonable bounds and a party is truly aggrieved, the judicial process will redress the wrong. It is in this context that the present case arises. The Birtcher Corporation appeals from a jury verdict awarding $50,000 in compensatory damages and $75,000 in punitive damages to the Diapulse Corporation of America, and nominal damages to six other plaintiffs, officers, and employees of Diapulse for allegedly libelous statements made about them. For the reasons set forth below, we affirm.
 
 
 2
 Both the Birtcher and Diapulse corporations are manufacturers of electrical modalities used in the medical treatment of various human illnesses. Birtcher, chartered under the laws of California, is the older and more firmly established enterprise. It was organized in 1936 and at the time of the alleged libels was the second largest producer of diathermy machines in the United States with annual gross sales of over $2,000,000. Diapulse, a relative newcomer, was formed in 1957 under the laws of Delaware to manufacture and sell the Diapulse machine, an invention of Dr. Abraham Ginsberg. Its net sales at the time of the alleged libels totaled approximately $362,000.
 
 
 3
 Birtcher manufactured a conventional diathermy machine — a device which creates an electromagnetic field producing electrical currents in that portion of the patient's body at which the treatment head is aimed. The principle upon which the machine functions is that the resistance of the body tissue to the current results in heat. The machine cost Birtcher approximately $300 to manufacture, wholesaled for about $600, and retailed for approximately $900. Unlike the conventional diathermy machine, the Diapulse device interrupts the current from 80 to 600 times a second in order to allow the heat produced to dissipate between pulsations. The postulate, much debated by medical experts, is that beneficial therapeutic effects can be achieved by radio waves alone, without the attendant thermal reaction that normally occurs in the absence of pulsed current. The Diapulse machine cost $750 to produce, and was sold to dealers for $1600, who in turn sold it to doctors for approximately $2300.
 
 
 4
 In 1954, Cecil J. Birtcher, president and moving force behind the defendant corporation, came to Dr. Ginsberg's New York office to discuss a proposal that Birtcher's company manufacture the Diapulse machine; but nothing developed from these talks. The libels alleged by the Diapulse Corporation and the other plaintiffs occurred some six years later and were three in number. The first was a letter written on November 11, 1960 by Cecil Birtcher to an old friend, and leading authority in the field of physical medicine, Dr. Frank H. Krusen of the Mayo Clinic, in which Birtcher stated that the Diapulse machine "is being sold under rather high pressure methods throughout the country to unsuspecting and perhaps ignorant physicians with rather fantastic claims," and that clinical support was based on claims by "a number of men called doctors who, upon investigation, turn out to be Chiropractors and by various `institutes' that no one ever heard of." Birtcher also said in his letter that the machine "is being pushed onto unsuspecting medical men at the fantastic price of $2300 each," and he described Dr. Ginsberg's office as being "suggestive of a mill and the whole thing seemed to me to be strictly a medical racket." The letter to Dr. Krusen inquired whether the Mayo Clinic had tested the Diapulse device and requested the results of such tests. Within a few days Dr. Krusen replied that tests had been made and that an unfavorable report had been published indicating that the Clinic was unable to find any of the unusual effects that were claimed.
 
 
 5
 The second alleged libel was grounded on a memorandum dispatched by Mr. Birtcher on December 2, 1960 to "All Birtcher Employees, Wholesale Field Engineers and Retail." One hundred copies were prepared and distributed in the following manner: 25 to retail salesmen, 9 to wholesale salesmen, 25 to salesmen in the home office, 8 to office managers in the home office, and the remaining 33 copies to Mr. Birtcher's secretary. In the memorandum, Birtcher stated that he had decided that the Diapulse "was simply rank misrepresentation and quackery." He quoted from Dr. Krusen's letter reporting the results from the Mayo Clinic test, and concluded by saying:
 
 
 6
 In my opinion, any surgical supply dealer or his salesmen, selling such a device to a doctor is guilty of unethical practices as he is merely seizing the opportunity to make a dollar and his customer, the doctor, accepts the device based on the misrepresentations of the dealer or the salesman.
 
 
 7
 As a matter of fact, I do not want merchandise which bears my name sold under the same auspices as those who will sell such quack devices.
 
 
 8
 Appellees introduced evidence to prove that this memorandum also was shown to three independent dealers of diathermy equipment.
 
 
 9
 The third alleged libel was published in a pamphlet of the Birtcher Corporation entitled "Quotable Quotes." Over 6000 copies of this publication were distributed in January 1961 to dealers, salesmen, physician's supply dealers, hospital supply dealers, and the corporate defendant's employees throughout the country. The pamphlet purported to quote from the report of the Mayo Clinic, but actually it presented the views expressed by Dr. Krusen in his letter to Mr. Birtcher. "Quotable Quotes" ended by stating:
 
 
 10
 The question is — Why should a physician pay $2400.00 for a Diapulse Machine when he can get the same and better results with a shortwave diathermy and spend only one-third of this amount? Shortwave is clinically proven therapy. Diapulse is not.
 
 
 11
 These three publications — (1) the November 11 letter to Dr. Krusen, (2) the December 2 memorandum, and (3) Quotable Quotes — gave rise to the instant suit. Appellant's principal contentions on this appeal are that there was not sufficient evidence to establish that the statements were untrue, and that the damages awarded were excessive. Before these are considered, however, there are two threshold questions which this court must resolve.
 
 I. Jurisdiction
 
 12
 The present action was commenced in the State Supreme Court, Nassau County, by service of process upon Louis Kogan, doing business in New York as an alleged managing agent of appellant under the name Birtcher Medical Distributors of New York. When the case was removed to the Federal Court, Eastern District, the Birtcher Corporation moved pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the action, contending that the court lacked jurisdiction because Birtcher was a foreign corporation not licensed to do business in New York and in fact was not doing business there. We conclude that this contention is without merit.[1]
 
 
 13
 Since this case is in the federal court by reason of diversity of citizenship, the question of amenability to suit must be determined by state law. See Arrowsmith v. United Press Int'l, 320 F.2d 219 (2d Cir. 1963). In New York prior to the passage of the Civil Practice Law and Rules (CPLR), a foreign corporation not authorized to do business in the state was amenable to local suit only if it had in fact been "doing business" in the state.[2] For nearly a half century the New York courts have adhered to Judge Cardozo's statement in Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 268, 115 N. E. 915, 918 (1917) that "there is no precise test of the nature or extent of the business that must be done," and the New York Court of Appeals declared only a few years ago that the facts in each case will determine whether or not a foreign corporation is "doing business."[3] Cf., Blount v. Peerless Chem. (P.R.) Inc., 316 F.2d 695, cert. denied, Colbert v. Peerless Chemicals (P.R.) Inc., 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963); MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832 (2d Cir. 1958). Recently, in Simonson v. International Bank, 14 N.Y. 2d 281, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964) the New York Court of Appeals declared that in actions commenced prior to the enactment of section 302 of the CPLR, jurisdiction will obtain over a foreign corporation if "it was engaged in such a continuous and systematic course of `doing business' here as to warrant a finding of its `presence' in this jurisdiction."
 
 
 14
 The facts in the case before us justify the conclusion that the Birtcher Corporation was "present" in New York at the time this suit was instituted. Since 1956 Kogan had been continuously engaged in business as the Birtcher Medical Distributors of New York; and, for a number of years the telephone listings in the New York City phone directories for the Birtcher Corporation and for the Birtcher Medical Distributors were identical. Kogan, as Judge Bruchhausen found, was the sole and exclusive distributor for Birtcher's products in New York and New Jersey, and this was displayed on the front window of the store. When the exclusive arrangement was agreed upon Birtcher Corporation dispatched a notice to all dealers in the specified area stating that:
 
 
 15
 Dealers in the State of New York and upper New Jersey will after September 1, 1956, purchase all goods manufactured by The Birtcher Corporation of Los Angeles direct from the Birtcher Medical Distributors of New York and the Birtcher Medical Distributors of New York will invoice the goods and payment will be made payable to the Birtcher Medical Distributors of New York.
 
 
 16
 This letter, it should be noted, made no mention of Louis Kogan or of any licensing, or distributorship arrangement. It simply and clearly implied that appellant had established a New York office through which it would conduct all of its business in that area. In the circumstances present here it was reasonable for Judge Bruchhausen to take Birtcher Corporation at its word and infer that it was indeed doing business in New York. Sales by Kogan of Birtcher equipment accounted for 5% to 10% of the latter's total gross sales. Kogan was in complete charge of granting franchises in both New York and New Jersey, and all repairs on Birtcher products in those two states were to be made by him. The totality of Kogan's activities on behalf of the Birtcher Corporation reveals that in actuality the latter had been engaged in a continuous and systematic course of doing business in New York, and therefore a suit could properly be maintained against it in the state courts.
 
 
 17
 We are also called upon to decide in this connection whether the service of process on Kogan conferred personal jurisdiction over the Birtcher Corporation. Since, as we have already indicated, the present action was commenced prior to the adoption of the CPLR, service of process had to be made in accordance with section 229(3) of the former Civil Practice Act. That section permitted personal service of a summons upon a foreign corporation to be made by delivering a copy of it to the "managing agent" of the corporation. The facts set out above clearly indicate that while perhaps not in name, Kogan was in fact Birtcher's managing agent. Service of process on him afforded reasonable assurance that the Birtcher Corporation would receive actual notice that it was being sued by Diapulse. See Den Heijher v. Erie R. R. Co., 171 F. Supp. 174 (S.D.N.Y.1959); International Business Machs. Corp. v. Barrett Div. Allied Chem. & Dye Corp., 16 A.D.2d 487, 229 N.Y.S.2d 547 (1962). Birtcher was doing business in New York and its managing agent was properly served. The District Court had jurisdiction.
 
 II. Failure to Register
 
 18
 Another question that this Court must consider before approaching the main contentions is whether the failure of Diapulse Corporation to register under the New York Education Law prevented it from maintaining this libel action. We agree with Judge Dooling that Diapulse was not barred from bringing this suit.[4]
 
 
 19
 Section 6805 of the Education Law, McKinney's Consol.Laws, c. 16, provides that "No manufacturer * * * of drugs or devices shall operate as a manufacturer * * * until the proprietor has applied for and received a registration certificate from the board."[5] At the time the present litigation was commenced, Diapulse Corporation was not registered under that section. In response to an inquiry by counsel for the Birtcher Corporation, a clerk of the Pharmacy Board stated that it was his understanding that Diapulse was not required to register. A year later, however, when defense counsel was preparing for trial, a similar inquiry was made. This time the response by the Secretary of the Pharmacy Board stated that if the Diapulse machine was as described, the manufacturer would have to register. The full circle of well-meaning but confusing and inconsistent interpretations was completed in May 1964, when the Counsel of the State Education Department advised plaintiff's counsel by letter that "The Department has never registered diathermy or similar machines and is not of the view that such registration is required."
 
 
 20
 In light of our determination we need not decide whether the Diapulse Corporation violated section 6805 of the Education Law.[6] The conflicting positions taken by the various state authorities indicate that any attempt by the Diapulse Corporation to have registered in 1956 most likely would have been unsuccessful. Moreover, and not of small significance, is the reality that even if New York did have a public policy requiring registration of such devices, such policy was quite feeble; thus, the state courts, as a matter of fair play, would not refuse to entertain a suit by an unregistered manufacturer. And, even if the failure by the Diapulse Corporation to register would have prevented it from bringing certain suits, the New York cases establish that Diapulse would not be barred from bringing this suit. The cases posit the maxim that failure to register will be fatal only when the cause of action involves the very essence of the regulatory scheme embodied in the particular statute which was violated. Thus Williams v. New York Herald Co., 165 App.Div. 529, 150 N.Y.S. 838 (1914) is of little solace to the appellant. There, a dairy company which violated the Penal Law by conducting its business under a fictitious name and without registering as required, could not recover damages in an action for libel. The objective of the Penal Law, the court pointed out, was to protect creditors who were dealing with individuals doing business under a name other than their own. The heart of the statute, therefore, was the registration of the fictitious name, and the failure of plaintiffs in the Williams case to register prevented their trade name from having any legally protected significance which would form the basis of an action for libel. The purpose of section 6805 of the Education Law, however, is quite different. The legislative history recorded on the jacket of the bill which brought the section into existence indicates, "The purpose is to have a list of all places in the state at which drugs and devices are manufactured, which will greatly facilitate the enforcement of the law." The law is thus aimed only at ascertaining the location of manufacturers of certain drugs and devices, and not the name under which the particular manufacturer conducts its business. The allegation in the present case, that the name "Diapulse" was defamed does not involve the essence of the regulatory scheme embodied in section 6805, and therefore appellees' failure to register does not bar them from bringing this cause of action.
 
 
 21
 Moreover, since the Birtcher Corporation is not a member of that class which section 6805 was designed to protect, we do not believe it has standing to raise the failure to register as a defense. We see this principle formulated in Rosasco Creameries, Inc. v. Cohen, 276 N.Y. 274, 11 N.E.2d 908, 118 A.L.R. 641 (1937). The New York Court of Appeals decided there, that the failure of a milk dealer to procure a license as required by law did not deprive him of the right to recover the reasonable value of milk sold to another dealer. The court found that the statute was enacted to protect producers and consumers, and therefore another dealer, not being a member of that class, could not raise the failure to register as a defense. In the present case, section 6805 is a police measure protecting the public health. It is not designed to protect the interests of competitors or critics of particular devices, and, accordingly, we are of the opinion that the Birtcher Corporation cannot properly defend by alleging that Diapulse failed to register. Judge Dooling properly held this defense to be insufficient in law.
 
 III. The Sufficiency of the Evidence
 
 22
 Having disposed of these troublesome threshold questions, we reach appellant's main contention — that there was a failure to establish by sufficient evidence that the three allegedly libelous publications were untrue. Truth is an absolute defense to a charge of libel; but it was also incumbent upon the Birtcher Corporation to sustain this defense at trial by a preponderance of the evidence. See, e.g., Dolcin Corp. v. Reader's Digest Assoc., Inc., 7 A.D.2d 449, 183 N.Y.S.2d 342 (1959). Appellant urges that it met its burden and that the trial court erred when it refused to grant a directed verdict or to order a new trial. On the record before us we conclude that the judge's denial of the motion was proper.
 
 
 23
 The directed verdict device was designed to be utilized in appropriate cases to spare the jury from lengthy deliberation when the evidence did not warrant it. When a party moves for a directed verdict the trial judge must determine as a matter of law whether there is sufficient evidence to take the case to the jury. "Only if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury." Baker v. Texas & Pac. R.R. Co., 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L. Ed.2d 756 (1959); see, e. g., Lifetime Siding, Inc. v. United States, 359 F.2d 657 (2d Cir. 1966); 5 Moore, Federal Practice, section 50.02(1), p. 2314. When reviewing the refusal of a judge to grant a directed verdict we must view the evidence and all the inferences which reasonably flow from it most favorably to the party against whom the motion was directed. See Moore, supra, at p. 2316; cf., O'Connor v. Pennsylvania R.R. Co., 308 F.2d 911 (2d Cir. 1962).
 
 
 24
 The trial in the present case developed into a battle of the experts, with each side relying heavily on its artillery of authorities on the subject. The testimony of these experts, as would be expected in a case such as this, was often in sharp conflict on the crucial issue of medical value of the Diapulse machine. The directed verdict would have been proper in this case, only if the evidence produced at the trial showed that all of the statements by Birtcher Corporation concerning the Diapulse device were true. See, e.g., Sather v. National Dairy Prods. Corp., Sup., 233 N.Y.S.2d 43 (Sup.Ct. 1962). But, in its pamphlet entitled "Quotable Quotes" Birtcher Corporation stated that "Shortwave is clinically proven therapy. Diapulse is not." Two witnesses testifying on behalf of Diapulse Corporation, however — Doctors Splitter and Wallis — stated that they had conducted clinical tests and believed the machine to be effective. Their testimony also contradicted the statement made by Cecil Birtcher in his letter dated November 11, 1960 to Dr. Krusen, that clinical support for the Diapulse device was based on claims "by a number of men called doctors who, upon investigation, turn out to be Chiropractors." Both Doctors Splitter and Wallis were general medical practitioners. It will be recalled that the letter to Dr. Krusen also stated that when Cecil Birtcher had visited Dr. Ginsberg, the inventor of the Diapulse device in 1954, he found the latter "operating under a clinic system suggestive of a mill and the whole thing seemed to me to be strictly a medical racket." Yet, shortly after that visit Birtcher had written a warm and friendly letter to Dr. Ginsberg in which he concluded by stating, "I will work up a proper agreement between us and submit it to you." And three years later Cecil Birtcher in an institutional advertisement entitled "To Heat or Not to Heat," mentioned Dr. Ginsberg in a complimentary context. Furthermore, in contrast to appellant's statement in his December 2, 1960 memorandum, that the Diapulse machine is "simply rank misrepresentation and quackery," witnesses on behalf of the appellees testified that the machine was effective without the production of heat; could penetrate clothes (except rubber garments); increased the peripheral blood flow; produced a pearl chain formation; stimulated the defense mechanism of the body and the RES (reticuloendothelial system); and did not provoke contraindications (reactions caused by the heat produced by conventional diathermy machines). Viewing this evidence most favorably to the appellees, as we must on the issue of sufficiency, it is clear that reasonable men could differ as to whether the statements made by the Birtcher Corporation were true or false. It follows, therefore, that the issue was one for the jury and the trial court properly refused to direct a verdict.
 
 
 25
 Appellant also complains that its motion for a new trial on the ground that the verdict was against the weight of the evidence, should have been granted. The granting or refusing of a new trial rests within the discretion of the trial court, and its decision will be reversed only for clear abuse of this discretion. See, e.g., Helene Curtis Indus. v. Sales Affiliates, 233 F.2d 148 (2d Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956). While it is true that the Diapulse Corporation engaged in "puffing" as to the virtues of its machine, we cannot say that the trial court abused its discretion by refusing to grant appellant a new trial. Indeed, the record taken as a whole indicates that the trial judge exercised his discretion wisely.
 
 IV. The Damages
 
 26
 Appellant's final contention is that the jury's award of compensatory damages of $50,000 and punitive damages of $75,000 is excessive.[7] While it is clear that we have the power to review a trial judge's refusal to set aside a verdict for excessiveness, and may resort to a remittitur in a proper case, Dagnello v. Long Island R.R. Co., 289 F.2d 797 (2d Cir. 1961), the scope of our review is quite narrow.[8] Judge Medina stated the Court's guidelines thus:
 
 
 27
 If we reverse, it must be because of an abuse of discretion. If the question of excessiveness is close or in balance, we must affirm. The very nature of the problem counsels restraint. Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. (Id. at 806.) (Emphasis supplied.)
 
 
 28
 And, we have indicated that we would modify a verdict only when the "jury awards something fantastic for his sort of harm." La France v. New York, N. H. & H. R.R. Co., 292 F.2d 649 (2d Cir. 1961) (emphasis supplied).
 
 
 29
 The facts in the present case do not convince us that the trial judge abused his discretion by refusing to order a new trial or a remittitur. While it is true that Diapulse Corporation was not a thriving enterprise at the time of the alleged libels, it was a young corporation with gross sales for the fiscal year ending September 1959 of $226,066 and a net income of $23,064. Between September 1959 and September 1960, 403 machines were sold grossing $363,237 with a net profit of $24,974. Based on these figures the jury's award of compensatory damages of $50,000 cannot be described as "fantastic" or as a "denial of justice." The same is true of the $75,000 award for punitive damages. The jury could have concluded from the evidence that the Birtcher Corporation had employed libelous statements to stifle competition from an up-and-coming competitor, and that a large verdict was necessary to deter such conduct in the future. The award may be viewed as reflecting the moral sense of the community and its desire to prevent repetition of this wrong committed upon one engaged in the competition of the free market place. We therefore decline to modify the award.
 
 
 30
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The motion to dismiss was heard by Judge Bruchhausen who concluded in an unreported memorandum opinion that jurisdiction over Birtcher Corporation had been properly obtained. He therefore denied the motion
 
 
 [2]
 Since the present action was commenced prior to the enactment of section 302 of the CPLR — New York's "long-arm" statute — the "transacts any business" test of that section is not applicable here. See Simonson v. International Bank, 14 N.Y.2d 281, 251 N.Y.S.2d 433, 200 N.E. 2d 427 (1964)
 
 
 [3]
 What constitutes "doing business" in order to render a foreign corporation amenable to process is not susceptible to exact delineation. Each case must be decided on its own facts having in mind the nature of the action or proceeding involved. To justify a civil suit against it and to satisfy due process requirements, the foreign corporation must possess such "minimum contacts" with the State that maintenance of the suit will not offend "traditional notions of fair play and substantial justice." La Belle Creole Int'l, S.A. v. Attorney General, 10 N.Y.2d 192, 197, 219 N.Y.S.2d 1, 5, 176 N.E.2d 705, 708 (1961)
 
 
 [4]
 Appellants' original answer did not raise the failure to register as a defense. Before the trial began, however, they moved to amend their answer to include this additional defense. In an extensive unreported memorandum Judge Dooling granted appellants' motion to amend, but he also granted appellees' cross-motion to dismiss the additional defense as insufficient in law
 
 
 [5]
 "Device" is defined in section 6801(26) of the Education Law as "instruments, apparatus, and contrivances * * *
 a. For the use in diagnosis, cure, mitigation, treatment or prevention of disease in man * * *."
 From the general registration requirement there is an exception, however, in section 6816 for certain medical equipment, including "therapeutic lamps."
 
 
 [6]
 Judge Dooling concluded that appellee was required to register because the Diapulse machine was a device within the meaning of section 6801(26) of the Education Law, and was not exempt under the exception for therapeutic lamps in section 6816(2) (e). We note that in or about March 1964 the Board of Pharmacy did register the Diapulse Corporation as as a manufacturer-wholesaler of the Diapulse machine
 
 
 [7]
 Appellant argues that the jury had no basis upon which to reach its figure of $50,000 because Diapulse Corporation offered no proof as to specific loss of sales. Appellant is precluded from raising this argument, however, because of its pre-trial stipulation that Diapulse would not have to produce such evidence
 
 
 [8]
 See Neese v. Southern Railway Co., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955)