**Dermott NOONAN, Plaintiff-Appellant,**

v.

**MIDLAND CAPITAL CORPORATION, Defendant-Appellee.**

No. 269, Docket 71-1130.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1971.

Decided Jan. 4, 1972.

James P. Costello, New York City (John J. Lynch, New York City, of counsel), for plaintiff-appellant.

Joseph Chase, New York City (Cleary, Gottlieb, Steen & Hamilton, and Edwin B. Mishkin, New York City, of counsel), for defendant-appellee.

Before LUMBARD and FEINBERG, Circuit Judges, and DAVIS, Judge.*

DAVIS, Judge:

In this diversity case, Dermott Noonan, an experienced accountant and management consultant, sues Midland Capital Corporation, a small business investment company, for failing to fulfill an alleged oral contract to pay him for personal business services. The major defense is that no such agreement was ever made. The trial was to a jury which was unable to agree after prolonged deliberation. The defendant then renewed its motion for a directed verdict which was granted by Judge Frankel because there was no evidence from which a jury could reasonably find the purported agreement between Noonan and Midland underlying this action. We uphold the District Court.

The matrix of the claim is this:—in 1966 and the first part of 1967 Midland loaned large sums to an ailing Georgia manufacturer, Textured Products Company, taking the latter's stock in pledge. As the trial judge put it: "Contrary to the expectations of all those interested, Textured Products did not prosper. By the spring of 1967, it had lost a great deal of money, and its imminent demise was a substantial possibility." Appellant Noonan had previously worked with Midland on a comparable project to save another corporate debtor, and early in 1967 Midland's president, Schabacker, asked him to consult on Textured's problem. After a couple of visits to the Georgia plant, plaintiff advised Midland that the operation could be salvaged and that he was willing to assist. Midland, through Schabacker, agreed to this "rescue attempt." It was understood that Noonan himself would spend considerable time at the factory and would also retain a full-time production expert. For its part, defendant would lend Textured large sums for its operating expenses during this period, and this was done. Plaintiff's fee was set at $7,500 per month. He and his associates worked on the project for some months beginning in April 1967, but the Georgia firm was not to be saved. By June or July 1967 manufacturing stopped there, and early in August the interested persons agreed that nothing more should or could be done. Plaintiff then prepared for Midland two reports on the matter.

Beginning in May 1967, Noonan submitted bills to Textured for his firm's work from April through October 1967.[1] Textured paid those for April and May, out of the funds advanced by Midland, and also an additional $2,500 in October (after the advances had stopped). Plaintiff sent Textured bills, which were not honored, until late in 1967, and in January 1968 first billed defendant for his unrecovered fees (which he sets at over $33,000). Defendant refused to pay and this suit resulted.

The case was tried and presented to the jury, with the concurrence of both sides, solely on the theory that there was an express oral agreement by Midland to pay Noonan, at the stated rate of $7,500 per month, for the services in connection with Textured, i.e. a direct, primary obligation on Midland's part, rather than

---

* Of the United States Court of Claims, sitting by designation.

1. The District Court found there was no evidence of any work done for the September and October bills.

Textured's being the direct and primary obligor. There was no attempt to show that Midland was secondarily liable if Textured, as primary obligor, failed to pay.[2] Nor was there any effort to prove that Midland breached its promise to make funds available to Textured. There was, moreover, neither a claim of a written contract nor a demand in *quantum meruit* for the value of services rendered. Plaintiff built his entire structure on the basis that Schabacker had verbally undertaken to have Midland itself pay the fee of $7,500 a month. It is the evidentiary strength of that foundation which is now before us, the dispositive issue being the sufficiency of the evidence to go to the jury.

■ We apply, of course, the accepted rule that "[w]hether the motion is one to direct a verdict or to set aside a verdict which the jury has returned, the test applied by the court is the same. The evidence must be viewed in the light most favorable to the party other than the movant. The motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." Armstrong v. Commerce Tankers Corp., 423 F.2d 957, 959 (2d Cir. 1970). See, also, Diapulse Corp. of America v. Birtcher Corp., 362 F.2d 736, 743 (2d Cir. 1966); Lifetime Siding Inc. v. United States, 359 F.2d 657, 662 (2d Cir. 1966). It may be noted, in this diversity action, that the New York rule on the granting of directed verdicts, if it is to be followed here (Calvert v. Katy Taxi, Inc., 413 F.2d 841, 846 (2d Cir. 1969)), accords with the general formulation. O'Connor v. Pennsylvania R.R. Co., 308 F.2d 911, 914–915 (2d Cir. 1962).

Under this standard, plaintiff's own version of his crucial conversation with Schabacker about the fee is quite enough, or at least very nearly so, to negative the existence of any undertaking by Midland to pay plaintiff for his services. Noonan testified that "Schabacker agreed * * * that Midland Capital would * * * authorize advancing of funds to Textured Products for operations, based upon a schedule to be submitted by the people at Textured Products and approved by me [Noonan]"; that "I advised Mr. Schabacker that our fee would be $7,500 a month * * * which was perfectly satisfactory to Mr. Schabacker" who said, "Fine"; that "in as much as Textured had no funds, insofar as the payment is concerned, that the funds would be furnished by Midland Capital to Textured Products in the sum of $7,500 to pay our fee when the bills were submitted, and the $7,500 would be added onto and over and above the operating fee—the operating sums needed for the daily operations * * *"; and that funds were in fact transmitted from Midland to Textured. Again, Noonan testified that Schabacker urged him "to take on this undertaking, that, in order to accomplish this they would supply the necessary funds for the operation of the plant and for the payment of the fees which would be $7,500 a month" and which were to be paid to plaintiff. This self-serving evidence shows that the most defendant did was, first, to urge plaintiff to shoulder the job of attempting to salvage Textured, and, second to agree to make funds available to the beleaguered firm with which the latter could pay plaintiff and his associates.

There is considerable other evidence supporting this as the actual arrangement, rather than an undertaking by Midland to be directly liable: (1) Noonan's prior connection with defend-

2. Without objection, the District Court told the jury: "If you were to find in this case that there was an agreement only to be secondarily liable and no agreement by Midland to accept the primary obligation, then you would be required on the undisputed facts to return a verdict for the defendant against the plaintiff * * *."

ant had involved management consulting services relating to another sick company in which Midland had a substantial financial interest, and in that instance he was paid by the debtor firm, not the defendant. (2) The parties stipulated that plaintiff reviewed the periodic requests from Textured to Midland for loan installments which were to cover the manufacturer's general expense "out of which plaintiff was to be paid"; he would therefore be, and was, able to monitor the funds flowing from Midland to Textured, so that his fees could be covered. (3) When Textured's president, about to pay Noonan on the latter's bill for April 1967, asked for an explanation to be shown to Textured's directors, Noonan wrote in his own hand, "At the recommendation of Midland Capital Corporation—Textured Products Corporation have retained Executive Management Service International [plaintiff's firm] as consultants to review the problems of the company in the area of production, sales and finances." (4) Noonan directed his invoices for compensation and expenses to Textured, rather than Midland, until after the former had collapsed, and did not bill Midland until much later. (5) He received payment from Textured on his first two bills to that company.

Against this compelling evidence for defendant, plaintiff marshals some items which, at best, are as consistent with appellee's view as with appellant's: (1) Midland invited him into the Textured matter and initiated the talks with him. (2) Midland urged him to go to Georgia to look over Textured's situation and then to try to help that company. (3) Textured was very badly off, insolvent, without funds, and both Midland and Noonan recognized this. (4) Defendant agreed that it would try to prevent Textured from collapsing, including the supplying of funds (for operations as well as for plaintiff's fee), while Noonan was working to rescue.

(5) The amount of Noonan's fee (including the hiring of associates) was discussed and agreed upon with Midland. Each of these pieces of evidence harmonizes with defendant's position that, as a large creditor, it was intensely interested in helping Textured to revive and survive, but that it never went further than to agree to lend additional funds from which the debtor could pay plaintiff along with its other operating expenses. On his side, Noonan, recognizing that Midland would aid Textured with these loans, could very well have believed that he was financially safe in taking on the project for that failing manufacturer.

■ Finally, appellant puts great stress on a letter in April 1967 from Textured's president which twice refers, tangentially, to plaintiff or his associate as "hired by Midland", in connection with a description of their activities and recommendations. This long letter was an internal Textured communication, "a review and report on activities since our last meeting" by Textured's chief officer to its board of directors; the letter was not directed to Midland which was neither bound by it nor called upon to respond or comment. Besides, in context the word "hired" in the letter seems to have been a colloquial or lay expression for "picked out" or "selected"; after all, Textured did pay plaintiff on his first two invoices and thereby recognized that it had "hired" him in the sense of retaining him.

■■ Like Judge Frankel—giving full credence to plaintiff's factual testimony,[3] to the other evidence in his behalf, and to the inferences reasonably flowing from that evidence—we conclude that, on the record and on the case as tried and presented, there could not be a reasonable difference among jurors as to the making of the contract asserted by appellant. A verdict for plaintiff "could only be the product of surmise, specula-

---

3. By factual testimony, we mean the hard facts as to things done or said, not plaintiff's legal conclusions on the stand that he was hired by and had contracted for pay with Midland, rather than Textured.

tion, and conjecture, and could not be derived from fairly weighing evidence." Calvert v. Katy Taxi, Inc., *supra*, 413 F. 2d at 844. That the case was originally sent to the jury which twice reported itself deadlocked, after considerable deliberation, does not mean that the actual disagreement was fair and reasonable. If the position of some jurors favoring plaintiff is enough, there could never be a judgment for insufficiency of the evidence notwithstanding a verdict, nor the direction of judgment on that ground after a mistrial. Both are commonplace and envisaged by Rule 50(b), F.R.C.P.

Affirmed.