**UNIJAX, INC., Plaintiff,**

**v.**

**CHAMPION INTERNATIONAL, INC., Defendant.**

**No. 77 Civ. 3355 (RLC).**

United States District Court, S. D. New York.

May 4, 1981.

Burns, Jackson, Miller, Summit & Jacoby, New York City, for plaintiff; Stuart A. Jackson, Michael G. Shannon and Joseph B. Pritti, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant; Stephen M. Hudspeth, Darrell E. Prescott, Douglas Broder and Leora Herrmann, New York City, of counsel.

OPINION

ROBERT L. CARTER, District Judge.

I

This is an action for treble damages for alleged violations of Section 1 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C. §§ 1 and 4 and a common law action for punitive and ordinary damages for tortious contractual interference.

Plaintiff is a Florida corporation with headquarters in Jacksonville, Florida. It is, among other things, engaged in the distribution of fine paper products and owns a chain of distribution outlets in approximately 16 cities in the southeastern part of the United States. For the purposes of this litigation, the southeastern part of the United States encompasses Florida, Alabama, Mississippi, Arkansas, Tennessee, Georgia, South Carolina, North Carolina, Virginia and the District of Columbia.

Defendant is a New York corporation engaged through a division, Champion Papers, in the manufacture, sale and distribution of fine paper products throughout the southeastern part of the United States and elsewhere. Prior to July, 1975, Unijax installations in Florida were the only distributors of Champion fine paper products in that state.

In February, 1976, Champion gave notice to Unijax that effective June 1, 1976, it would terminate Unijax outlets in Florida (Miami, Tampa, Tallahassee, Orlando and Jacksonville) and Georgia (Macon and Atlanta) as distributors of Champion paper. In late March, 1976, Walter Moore, President of Unijax and Mark Fuller, Champion Vice President, Sales, met in West Palm Beach and agreed that the June 1, 1976 termination date would be pushed back to July 15, 1976, that Macon and Atlanta would not be terminated and that Unijax would not institute litigation against Champion for terminating the Unijax distribution installations in Florida. Purchases of Pinehurst and other lines of Champion paper increased in 1975 and thereafter.

Plaintiff claims that it was forced to agree not to purchase the merchandise of any of defendant's competitors and to accept a tying arrangement as a condition for plaintiff to continue to receive a cast coated line of fine paper sold by Champion under the trade name Kromekote, which plaintiff alleges is unique in the industry—all in violation of the Sherman and Clayton Acts, 15 U.S.C. §§ 1 and 4. In addition to these antitrust claims, plaintiff charges defendant with wrongfully inducing Franklin Ray to leave plaintiff's employ to work for defendant's wholly owned subsidiary, Nationwide Papers, and wrongfully to cancel a Unijax-Memphis order of Champion products for Holiday Press and fill that order through Nationwide Papers. Punitive damages were sought on these common law claims.

1. The special verdict questions and answers on liability are set out below:

MEMPHIS CLAIM

1. Has the plaintiff established by a preponderance of the evidence that defendant interfered with an existing contract between Unijax-Memphis and Holiday Press?

    Yes _x_  No___

2. Has the plaintiff established by a preponderance of the evidence that defendant interfered with Unijax's prospective business relations with Holiday Press?

    Yes _x_  No___

    If your answer to Question 2 is YES, go to Question 3.

    If your answer to Question 2 is NO, go to Question 4.

3. Has the plaintiff established by a preponderance of the evidence that defendant had waived its privilege to compete with plaintiff in Memphis?

    Yes _x_  No___

TYING CLAIM

4. Has the plaintiff established by a preponderance of the evidence that Unijax entered a coerced tying agreement which required Unijax to buy Champion uncoated commodity paper in order to buy Kromekote?

    Yes _x_  No___

5. Has the plaintiff established by a preponderance of the evidence that Unijax entered a coerced tying agreement which required Unijax to buy more Champion coated and uncoated paper in order to buy KromeKote?

    Yes _x_  No___

    If your answer to Questions 4 and 5 were BOTH NO, go to Question 10.

The case was bifurcated for trial before a jury. The liability phase of the trial began on December 3, 1979. Ten jurors were selected, and the parties agreed that all ten would participate in all the jury deliberations throughout the two phases of the trial, and that if any jurors had to be excused, the trial would continue with the remainder of the panel as long as the number of jurors was not reduced below a total of 6.

On January 7, 1980, at the conclusion of the liability phase of the proceeding, the jury found that plaintiff had established defendant's liability for tortious interference with an existing contractual agreement and prospective business between Unijax-Memphis and Holiday Press, that it had been coerced by defendant to participate in a tying arrangement, but that plaintiff had failed to establish a coerced exclusive dealership.[1] The trial then proceeded immedi-

If your answer to Questions 4 and 5 were BOTH YES, go to Question 6.

If your answer to EITHER Questions 4 or 5 was YES, go to Question 6.

6. Has the plaintiff established by a preponderance of the evidence that Champion possesses sufficient economic power in Kromekote to appreciably restrain competition in the tied product market?

    Yes _x_  No___

7. Has the plaintiff established by a preponderance of the evidence that a not insubstantial amount of commerce was foreclosed in the tied product as a result of any tying agreement you found in Questions 4 and 5?

    Yes___  No _x_

    If your answers to Question 6 and Question 7 were BOTH NO, go to Question 8.

    If your answer to Question 6 and Question 7 were BOTH YES, go to Question 9.

    If your answer to EITHER Question 6 or Question 7 was YES, go to Question 9.

8. Has the plaintiff established by a preponderance of the evidence that the tying agreement amounted to an unreasonable restraint of trade in fine paper in the relevant market?

    Yes___  No___

    If your answer to Question 8 was YES, go to Question 9.

    If your answer to Question 8 was NO, go to Question 10.

9. Has the plaintiff established by a preponderance of the evidence that the tying arrangement was a proximate cause of injury to plaintiff?

    Yes _x_  No___

ately to the issue of damages. On January 10, 1980, the jury awarded $595,781.06 to the plaintiff on the tortious interference claim, $500,000 of which constituted an award for punitive damages and $726,742 on the antitrust claims, the latter amount to be tripled for a total of $2,180,226.

Defendant has moved for judgment n. o. v. on the antitrust and common law claims and on the issue of damages. Plaintiff has moved for judgment n. o. v. on the issue of whether a substantial amount of commerce was foreclosed in the tied products as a result of the agreement, which the jury in its special verdict answered in the negative. Plaintiff also seeks judgment n. o. v. on the issue of an agreement not to sue, which the jury in its special verdict found to exist, on the ground that an affirmative defense based on such an agreement is barred by the statute of frauds. Plaintiff also contends that it is entitled to judgment n. o. v. holding that defendant materially breached the agreement not to sue and that the tying agreement constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act and that there was a coerced exclusive dealership agreement. In the alternative, both parties move for a new trial.

EXCLUSIVE DEALING CLAIM

10. Has the plaintiff established by a preponderance of the evidence that defendant coerced plaintiff to agree to an exclusive dealing agreement?

      Yes___    No x

If your answer to Question 10 was YES, go to Question 11.
If your answer to Question 10 was NO, go to Question 13.

11. Has the plaintiff established by a preponderance of the evidence that the agreement had a substantially adverse effect on competition in fine paper in the relevant market?

      Yes___    No___

If your answer to Question 11 was YES, go to Question 12.

If your answer to Question 11 was NO, go to Question 13.

12. Has the plaintiff established by a preponderance of the evidence that the exclusive dealing arrangement was a proximate cause of injury to Unijax?

      Yes___    No___

AGREEMENT NOT TO SUE

13. Has the **defendant** established by a preponderance of the evidence that the parties made a contract which included an agreement by the plaintiff not to sue the defendant over the Florida terminations?

      Yes x    No___

## II

### Determination

The controlling principle that guides trial courts in this circuit to decision on motions for directed verdicts and judgments n. o. v. is "whether the evidence is such that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). In considering a motion for judgment n. o. v., the evidence must be viewed in the light most favorable to the non-moving party and "will be granted only if (1) there is a complete absence of probative evidence to support the verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair-minded men in the exercise of impartial judgment could not arrive at a verdict against him." (citations omitted) *Armstrong v. Commerce Tankers Corp.*, 423 F.2d 957, 959 (2d Cir.), *cert. denied*, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970); *Noonan v. Midland Capital Corp.*, 453 F.2d 459, 461 (2d Cir.),

If your answer to Question 13 is NO, stop.

If your answer to Question 13 is YES, go to Question 14.

14. Have you found by a preponderance of the evidence that Mr. Moore's memorandum (Defendant's Exhibit J-16) of his meeting with Mr. Fuller identifies with reasonable certainty the parties to this contract, the subject matter of the contract, and the essential terms of the contract?

      Yes x    No___

If your answer to Question 14 is NO, stop.

If your answer to Question 14 is YES, go to Question 15.

15. Has the plaintiff established by a preponderance of the evidence that the contract was an integral part of or in furtherance of an unlawful agreement between the parties which you have already found to be an antitrust violation?

      Yes x    No___

If your answer to Question 15 is YES, stop.

If your answer to Question 15 is NO, go to Question 16.

16. Do you find by a preponderance of the evidence that Champion materially breached its obligations under the contract?

      Yes___    No___

*cert. denied*, 406 U.S. 495, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972). Most recently in *Mattivi v. South African Marine Corp.*, *"Huguenot"*, 618 F.2d 163, 167 (2d Cir. 1980), the above principle was reaffirmed as the controlling yardstick to be utilized in making directed verdict or judgment n. o. v. determinations.

In a civil antitrust action the plaintiff has the burden of proving every element of the claimed violations. *See e. g., Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Accordingly, Unijax had the burden of introducing evidence from which the jury might reasonably infer that Champion had coerced plaintiff into joining a conspiracy to restrain trade, *M.C. Manufacturing Co. v. Texas Foundries*, 517 F.2d 1059 (5th Cir. 1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976), by forcing on plaintiff an exclusive dealership and an illegal tying arrangement, *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 377–79 (5th Cir. 1977), and that plaintiff suffered injuries proximately attributable to these antitrust violations. *M.C. Manufacturing Co. v. Texas Foundries, supra; Kentucky Fried Chicken v. Diversified Packaging Corp., supra; Cinema-Tex Enterprises, Inc. v. Santikos Theatres, Inc.*, 535 F.2d 932 (5th Cir. 1976); *Reading Industries v. Kennecott Copper Corp.*, 477 F.Supp. 1150 (S.D.N.Y.1979) (Lasker, J.), *aff'd*, 631 F.2d 10 (2d Cir. 1980). It is not defendant's burden to prove the lack of a conspiracy, or the absence of an exclusive dealership or that no tying arrangement existed. *Karlinsky v. New York Racing Assn., Inc.*, 517 F.2d 1010 (2d Cir. 1975).

The jury found that plaintiff had failed to establish that it was coerced into buying fine paper exclusively from defendant and in refusing to buy the products of defendant's competitors. The jury's verdict must be sustained on this issue because no proof was presented to establish that claim. Indeed, the evidence appears to negate exclusivity. The proof shows that plaintiff did in fact do substantial business with at least two companies which were manufacturers largely of uncoated fine paper—Union Camp, Nekoosa Edwards—and Gilbert, a third company, which manufactured coated paper as well.

Unijax's purchase of Union Camp fine paper totaled $13,000 in 1974; $2,165,000 in 1975; $2,925,001 in 1976 and $4,749,130.81 as of November 29, 1977. Unijax-Florida's share of these purchases was $1,015,839 in 1975 and $1,573,551 in 1976. Atlanta purchased 594.8 tons of paper from Union Camp in 1975, 860.6 tons in 1976 and 1,191.5 tons in 1977. Unijax's purchases of fine paper from Nekoosa Edwards totalled $5,191,560 in 1974; $5,910,125 in 1975; $5,643,921 in 1976 and $7,501,702 in 1977. Florida's share of these purchases were $1,614,210 in 1974; $1,903,514 in 1975 and $1,975,577 in 1976. Its purchases from Gilbert were constant.

The parties have stipulated that Unijax has sold fine paper products of Scott, Crown-Zellerbach and Plainwell, among others, and that these companies and Mead, Midtec, Consolidated, Northeast, James River, St. Regis, International Paper and Hammermill sell various grades of fine paper in the southeastern part of the United States.

Plaintiff never sought to establish that it was forced by Champion to refrain from buying from these companies. Plaintiff's proof merely sought to show that other companies did not make a coated grade of fine paper comparable to or that could be substituted for Champion's Kromekote line. Plaintiff did claim that Champion sought to bar it from buying from Union Camp, but the sales figures would indicate that this effort failed.

Since there is no basis for disturbing the jury verdict on the absence of an illegal exclusive dealership, the claim of exclusive dealing has been properly removed from the case, and the efficacy of plaintiff's antitrust claims now depends wholly on whether the evidence establishes the existence of an illegal tying agreement.

■ "[T]ying agreements fare harshly under laws forbidding restraints of trade." *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 606, 73 S.Ct. 872, 879, 97 L.Ed. 1277 (1953). "By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of the buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." *Id.* at 605, 73 S.Ct. at 878. Since if the tied product possessed superiority in its own right, it would survive in the open market, the only purpose a seller seeks to accomplish in enforcing a tying agreement is a reduction of competition. The element essential to the establishment of a tying agreement is a showing that the seller possesses sufficient economic power in the tying commodity, *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), and that the buyer was forced to purchase another product, the "tied commodity," in order to obtain the tying product. *Times-Picayune Publishing Co. v. United States, supra* 345 U.S. at 614, 73 S.Ct. at 883; *Shell Oil Co. v. FTC*, 360 F.2d 470 (5th Cir. 1966), *cert. denied sub nom. Firestone Tire & Rubber Co. v. F. T. C.*, 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *Northern v. McGraw Edison Co.*, 542 F.2d 1336 (8th Cir. 1976), *cert. denied sub nom. McGraw Edison Co. v. Soper*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977); *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2d Cir. 1976).

■ However, the fact that tying arrangements are illegal per se, *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), *appeal after remand*, 452 F.2d 1095 (6th Cir. 1971), *cert. denied*, 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119 (1972); *Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993 (9th Cir. 1975), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49, does not relieve plaintiff of the burden of establishing that a tie-in actually occurred. A formal agreement is not necessary to establish the existence of a tie-in, *Ungar v. Dunkin Donuts of America*, 531 F.2d 1211, 1214 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and a tying agreement may be evidenced by the business conduct of the parties. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1977). No illegal tying arrangement, however, can be found by the trier of fact unless the evidence establishes that coercion by the seller influenced the buyer's choice, *Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatre, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752, and that the party aggrieved has been forced to buy something he did not want. *Capital Temporaries, Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 662 (2d Cir. 1974). The burden of establishing coercion is on the plaintiff. *Ogden Food Service Corp. v. Mitchell*, 614 F.2d 1001 (5th Cir. 1980). Coercion may be established circumstantially, inferentially or deductively, however, "it cannot be merely conjured.... It is a fact that must be established. *Kentucky Fried Chicken v. Diversified Packaging Corp., supra*, 549 F.2d at 377.

Sometime prior to 1975, Earle Bensing, manager of Champion's Atlanta sales office, began to express dissatisfaction with the purchase and sale of Champion products by Unijax distribution outlets in Miami, Tampa, Tallahassee, Jacksonville and Orlando. There were a number of meetings between 1972–75 among the parties about how to improve this picture. Unijax distribution outlets in Florida sold more fine paper of uncoated grades than the more expensive coated grades of fine paper. Bensing in particular was not happy with what he considered the concentration of Unijax in Florida on cheaper grades of paper. Champion, in 1974, discontinued the manufacture of an uncoated grade of fine paper which was sold under the brand name

Skyland Offset, and Unijax negotiated with Union Camp, a manufacturer of uncoated fine paper, to supply these grades to its Florida outlets and has sold and distributed Union Camp fine paper products since 1974.

Bensing did not approve of this arrangement because, in his view, it meant that Unijax would not be concentrating its efforts on selling the premium Champion grades. In 1975, Bensing instituted the procedure of written reviews of the performance of the Unijax distribution outlets in selling Champion products. His reviews were extremely critical of the performance of Unijax distribution outlets in Florida and Georgia in selling Champion fine paper. Figures for 1972–1975 for the period January-September compiled by Champion showed a decline in the sale of Champion products by Unijax outlets in Jacksonville, Orlando, Tallahassee, Tampa, Miami, Macon and Atlanta.

At a meeting on February 17, 1976, in Jacksonville attended by Champion and Unijax personnel, Mark Fuller of Champion hand delivered to Walter Moore of Unijax a letter dated February 13, 1976, noticing effective June 1, 1976, Champion's termination of business with Unijax distribution outlets in Miami, Tallahassee, Tampa, Orlando, Jacksonville, Macon and Atlanta. Fuller and Moore met at the latter's request in West Palm Beach on March 26, 1976. Fuller agreed to postpone the termination date of the Florida outlets from June 1 to July 15, 1976, and to remove Macon and Atlanta from the list of outlets to be terminated. Moore agreed that Unijax would not institute litigation to contest the Florida terminations.

Since the termination of Unijax outlets in Florida, the non-Florida outlets of Unijax have increased their purchases of Champion products, and Unijax has supplied its Florida outlets with Champion fine paper by shipping such supplies to Florida from Atlanta. This has added to Unijax's overhead in terms of transshipment costs.

Plaintiff's proof concerning the illegal tying arrangement was presented through the testimony of several Unijax employees, but the basic evidentiary foundation on which the claim is structured must be found in the testimony of Walter Moore. While Moore's testimony was not a model of clarity, consistency or preciseness, a fair summary according all inferences favorable to plaintiff will be assessed. According to Moore, at a meeting in Hamilton, Ohio in 1972, Champion wanted help from Unijax in selling Kromekote since Champion was experiencing difficulty in selling this line. Indeed, Champion was in trouble with all Hamilton grades—Javelin and Wedgwood as well. A marketing plan was developing for an increase in the purchase of Kromekote, Wedgwood and Javelin by 20%.

■ At that time Champion was also attempting to push another line called Micron. Moore cites pressure from Champion to buy Micron as evidence of coercion. However, he testified Unijax refused to succumb and that Unijax bought no Micron after 1972. There can be no coercion in the antitrust sense unless the victim is required to buy the tied product. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., supra; Speed Auto Sales Inc. v. American Motors Corp.*, 477 F.Supp. 1193 (E.D.N.Y.1979). Mere attempts to persuade a buyer to buy the seller's product do not violate the antitrust laws. *Osborn v. Sinclair Refining Co.*, 286 F.2d 832 (4th Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961), *on remand*, 207 F.Supp. 856 (D.Md.1962), *rev'd*, 324 F.2d 566 (4th Cir. 1963).

Moore met with Bensing in Jacksonville in October, 1975. Bensing told him that Unijax's failure to purchase sufficient quantities of Champion products was making his office look bad and that some of Unijax's Florida outlets might be cut off because they were not doing a good enough job in selling Champion paper. Moore issued a directive to his Florida installations to increase their inventories of Champion paper. He did not ask the outlets to buy more of a particular Champion grade, nor was the directive prompted by a fear that a particular grade of paper would be cut off. The directive was concerned with the loss of

Champion dealership unless more Champion products were bought. He estimated that there was approximately a 10,000 ton increase in the purchase of Champion paper in 1975, but did not attribute the increase to coercion by Champion.

After the Florida terminations in 1976, instructions were given to non-Florida units to buy more Champion products. In April, 1976, Moore, Carl Bloesing, Unijax's Vice President and regional general manager,[2] Fuller and Bensing met in Champion's Atlanta office. Moore and Fuller directed Bloesing and Bensing to establish a mutually acceptable goal for the sale of Champion products by Unijax outlets in Atlanta and Macon. Bloesing and Bensing subsequently established sales goals for these two houses which were submitted to Moore and Fuller for their approval.

A master warehouse was set up in response to Fuller's request for a program in Unijax outlets outside Florida to promote Champion products more actively. Moore testified that there was no coercion in 1972, 1973, or 1974 and no coercion on the non-Florida outlets in 1975. Indeed, in 1973 and 1974, many grades of Champion fine paper were on allocation, but early in 1975 the fine paper market became depressed. In 1978 allocation was again imposed.

Moore testified that he was coerced in 1976 and 1977 into buying more Champion products and directed his Unijax branches to increase their inventory of Champion products. No one at Champion told him that he had to buy any particular Champion grades or what quantity to buy. These were in house decisions made by Unijax

personnel. He testified that the Kromekote line of Champion products was very much desired, and there is testimony that increased purchase overall of Champion products was intended to insure that the supply of Kromekote not be cut off. He testified that no one at Champion conditioned the continued supply of Kromekote on his increased purchases, however.

What his testimony amounts to is that his fear of Champion terminating its connection to the Unijax non-Florida houses was what prompted the various memoranda to his subordinates urging increased buying of Champion fine paper. I do not believe this testimony supports the existence of coerced tying purchases since basic to a tying agreement is coercion by the seller to force the buyer to buy a tied product he does not desire in order to secure the tying commodity he wishes to have. *Capital Temporaries, Inc. of Hartford v. Olsten Corp., supra*, 506 F.2d at 661–63. Buying more of the sellers product to insure that one is not terminated as the seller's distributor does not constitute an illegal tying arrangement in the antitrust sense. The hope of preserving a distributorship and attempts to ingratiate oneself with the seller by buying large quantities of its products do not have the impact on competition which is the basis for condemnation of tying agreement in laws forbidding restraints of trade.

Moore testified that in 1976 there was an increase of approximately 4,000 tons in purchases of Champion products by Unijax. Moore attributes about 50% of that increase to coercion.[3] He instructed his regional

2. The following Unijax branches were within Bloesing's region: Columbia, South Carolina; Savannah and Atlanta, Georgia and Memphis, Tennessee.

3. The evidence disclosed the purchases by non-Florida outlets of Champion's Pinehurst and Champion products overall for the years 1975–1978 were as follows: Charlotte bought 28 tons of Pinehurst in 1975, 98 tons in 1976, 94 tons in 1977, and 109 tons in 1978. Its overall purchases of Champion products grew from 2,687 tons in 1975 to 5,025 tons in 1978. Columbia bought 158 tons of Pinehurst in 1975, 87 tons in 1976, 83 tons in 1977, and 55 tons in 1978. Its

overall purchases rose from 437 tons in 1975 to 690 tons in 1978.

Mobile, Alabama purchased 46 tons of Pinehurst in 1975, 66 tons in 1976, 79 tons in 1977, and 67 tons in 1978. Overall, it purchased 112 tons of Champion products in 1975, 186 tons in 1976, 161 tons in 1977 and 298 tons in 1978. Raleigh purchased 3 tons of Pinehurst in 1976, 58 tons in 1976, 98 tons in 1977, and no Pinehurst in 1978. Overall it purchased 4,008 tons of Champion fine paper in 1975, 5,480 tons in 1976, 6,559 tons in 1977, and 6,723 tons in 1978. Richmond purchased 22 tons of Pinehurst in 1975, 426 tons in 1976, 555 tons in

general managers in 1976, Bloesing and Samuel S. Hales,[4] that if there was a choice, that is, unless required by customer specification to do otherwise, to buy Champion products. No instruction was given to his regional managers that they buy more of any particular grades. Bloesing and Hales in turn instructed the units in their region to buy more Champion paper. Bloesing and Hales testified that Moore issued instructions to them to give Champion favorable treatment, to purchase from Champion over other suppliers, and that price was not to be a consideration. Moore testified that the addition of specification personnel, i. e., personnel concerned with promoting Champion products at various Unijax installations resulted from coercion by Champion.

■ The necessary ingredients to establish the existence of a tying agreement were absent from plaintiff's evidentiary presentation. It is true that interlarded in Moore's testimony is the statement that he was coerced, but this is conclusory not evidentiary testimony. It is also true that Moore refers to incidents in 1972 as coercion, but then states that no coercion occurred in that year. Although the evidence must be viewed in the light most favorable to the plaintiff, a conclusive deficiency of proof requires an overturn of the jury's verdict. Granting judgment n. o. v., like granting a directed verdict, "is a method for protecting neutral principles of law from powerful forces outside the scope of law—compassion and prejudice." *Rutherford v. Illinois Central R. R. Co.*, 278 F.2d 310, 312 (5th Cir.) *cert. denied*, 364 U.S. 922, 81 S.Ct. 288, 5 L.Ed.2d 261 (1960).

■ The basic requirement for a tying agreement is that there be two separate and distinct products, and an agreement by defendant to sell plaintiff one product only on condition that the latter also purchase the other product. *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). While there was testimony concerning Kromekote's uniqueness, there was absent any evidence, on a fair reading of this record, that plaintiff had to buy a different Champion product or products to secure Kromekote. Absent such proof, there can be no illegal tying agreement. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., supra.* Champion's threat to Unijax that it would terminate all relationship with Unijax unless more Champion products were bought is not an illegal tying agreement. *Osborn v. Sinclair Refining Co., supra.* Even assuming *arguendo* that plaintiff's proof shows that it accepted uneconomic secondary products and that defendant possessed dominant economic power and utilized that power to require plaintiff to buy more of its goods, this is not sufficient to support a finding of an illegal tying agreement. *Ungar v. Dunkin Donuts of America, Inc., supra.*

Since I hold there was no proof of a tie and since such proof was necessary on this record to support plaintiff's antitrust claims, defendant's other arguments in support of its motion for judgment n. o. v. on the antitrust issues need not be reached. Judgment n. o. v. is granted defendant on the antitrust issues.

Defendant also seeks judgment n. o. v. on the common law claims. Unijax-Memphis was Champion's sole distributor in the area, but there was no exclusive dealership agreement between them.

---

1977 and 339 tons in 1978. Overall Richmond purchased 1,805 tons of Champion products in 1975, 2,708 tons in 1976, 2,302 tons in 1977 and 1,537 tons in 1978.
Roanoke purchased 155 tons of Pinehurst in 1975, 65 tons in 1976, 50 tons in 1977 and 2 tons in 1978. Overall Roanoke purchased 288 tons of Champion paper in 1975, 153 tons in 1976, 915 tons in 1977, and 1,438 tons in 1978. Savannah purchased 17 tons in 1975, 136 tons in 1976, 86 tons in 1977 and 7 tons in 1978.

Overall, it purchased 172 tons of Champion paper in 1975, 423 tons in 1976, 217 in 1977 and 24 tons in 1978.
Atlanta purchased 137 tons in 1975, 46 tons in 1976, 265 tons in 1977 and 251 tons in 1978. Atlanta purchased 814 tons of Champion paper in 1975, 976 tons in 1976, 1,951 tons in 1977, and 2,337 tons in 1978.

4. Hales' region consisted of Virginia, West Virginia and North Carolina.

Considerably before 1970 the Tayloe Paper Co. at Memphis was a distributor of fine paper products manufactured by Champion. In 1972 Unijax acquired the Memphis unit from Tayloe. At the time of the Unijax acquisition Jerry York was fine paper sales manager of the Memphis unit and Franklin Ray was a fine paper salesman employed there. Both had held their positions for a number of years prior to 1972. York continued as fine paper sales manager until June, 1976, when he resigned to take a position with another paper company in Memphis.

On August 18, 1976, Franklin Ray advised Robert Erwin, who had succeeded York as fine paper sales manager, that he was resigning as fine paper salesman and that he wished his resignation to become effective within two weeks. Erwin ordered Ray to leave at once. There was no contract of employment between Unijax and Ray.

Holiday Press located, in Olive Branch, Mississippi, was a purchaser of Armour Web and Armour Deluxe, brand names for a line of fine paper manufactured by Champion. On August 18, 1976, Ray instructed Lloyd Scott Barnard, district manager of Champion at St. Louis, to cancel an order for Armour Web paper placed with Champion through Unijax by Holiday Press. Barnard requested that the cancellation be confirmed in writing, and Ray did so by letter on Unijax stationary dated August 18, 1976.

After leaving Unijax, Ray entered the employ of Nationwide Papers, which is a division of Champion engaged in the distribution of fine papers. Nationwide Papers is headquartered in St. Louis. He then placed an order for Armour Web for Holiday Press through Nationwide Papers identical to the order which he had cancelled on August 18. Nationwide earned a commission of $7,500 on the order. Ray obtained the business of many of the accounts he had serviced as a Tayloe and Unijax employee when he became an employee of Nationwide.

Prior to Ray's leaving Unijax, Barnard of Champion had been aware of his restlessness. He had talked to William Hatch, head of Holiday Press, who was aware of Ray's readiness to leave Unijax-Memphis and was prepared to have Ray continue to handle Holiday Press fine paper purchases wherever he went. Barnard had also brought Ray to the attention of executives of Nationwide Papers and had urged them to consider hiring him.

Since there was no contract of employment between Ray and Unijax, Ray was free to leave Unijax's employ, and there was nothing to prevent Nationwide from hiring Ray away from Unijax. The jury found that Champion had interfered with an existing contract between Unijax and Holiday Press. The finding will be left undisturbed. It was clear that Unijax had placed an order for Holiday Press with Champion, and while that order was subject to last minute cancellation, the way Barnard allowed the order to be cancelled by Ray and resubmitted through Nationwide Paper is sufficient to support the jury's conclusion of interference. Barnard on August 18, 1976, knew that Ray was about to move on, probably to Nationwide Papers, and to allow him to cancel the order from Unijax which Ray was about to leave and then resubmit it on behalf of Nationwide Paper where he had just been hired partly through Barnard's intervention could be seen by the jury as interference.

However, the evidence does not support interference with prospective business relations. The evidence discloses that Unijax, when it bought the Tayloe installation, inherited the Holiday Press business. The Holiday account had been serviced by Ray, and when he left he took it with him. There was no contract between Holiday and Unijax, and each was free to sever the relationship at will.

While the jury was charged that interference with prospective advantage constituted a tort in Tennessee, defendant has cited *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476, 485 (Tenn.App.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979), for the proposition that such a tort is not cognizable under the law

of Tennessee. At any rate, under the law as charged, the jury had to find malice or motivation to harm to sustain a finding of tortious interference or to support punitive damages. The only evidence going to that issue is Barnard's testimony that he did not advise Erwin that the latter was about to lose Ray and the Holiday Press account because he felt Erwin had mistreated him in the past. There was no fiduciary relationship between Champion's district office in St. Louis and Unijax-Memphis. A business relationship existed in which each sought the best advantage for itself from the transaction. No confidentiality or relationship of trust, aside from the accepted mores of the market place, was involved. *See Nifty Foods Corp. v. The Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 838 (2d Cir. 1980). There is no evidence to support a finding of tortious interference such as to warrant the imposition of punitive damages. Accordingly, judgment n. o. v. is granted for defendant in respect of the awards to plaintiff for tortious interference for prospective and for punitive damages.

Thus the award of $83,940.27 for tortious interference with prospective advantage and the award of $500,000 in punitive damages in regard thereto ($583,940.27) and the awards of $90,000; $566,296; $62,496 and $7,950 ($726,742) on the antitrust claims are set aside. The jury awards of $6,840.89 for interference with an existing contract and punitive damages of $5,000 for that interference is allowed to stand.

SETTLE ORDER.