George LAMBORN, Henry Maringer
and Lamar Commodities, a
Partnership, Plaintiffs,

v.

Thomas H. DITTMER and Dittmer
International, Inc., Defendants.

No. 83 Civ. 2493 (RLC).

United States District Court,
S.D. New York.

May 26, 1988.

Curtis, Mallet–Prevost, Colt & Mosle, New York City (Peter Fleming, Jr., Herbert Stoller, T. Barry Kingham, Jacques Semmelman, David Fredrickson, of counsel), for plaintiffs.

Graubard Moskovitz Dannett Horowitz & Mollen, New York City (Jack Weinberg Alan A. Harley of counsel); Schiff Hardin & Waite, Chicago, Ill. (Susan R. Lichtenstein, of counsel), for defendants and counterclaimants.

## OPINION

ROBERT L. CARTER, District Judge.

This action revolves around the allegedly wrongful dissolution of a partnership. After roughly a three-week trial resulting in a jury verdict of $30 million for plaintiffs, defendants move for judgment n.o.v. or, in the alternative, for a new trial. Defendants assert five bases for their two pronged motion: (1) the speculative nature of plaintiff's testimony regarding Refco International Futures' ("RIF") value, plus lack of support for testimony in the record; (2) counsel for plaintiffs appealed to the passions and prejudices of the jury and injected his own opinion of the credibility of various witnesses; (3) plaintiffs' attorney should have been disqualified, and the court should have allowed defendant to call plaintiffs' attorney as a witness; (4) it was error to permit plaintiffs to introduce a document labelled "Refco Inc. Clearing Charges to RIF" as overcharges, and to bar testimony concerning plaintiffs' employment and earnings since RIF's dissolution; and (5) the court should have directed a verdict that RIF was properly dissolved and in favor of Dittmer on the counterclaim.

We deal with the motion for judgment n.o.v. first. The basic rule is that a judgment n.o.v. will not lie unless a motion for a directed verdict has been made at the close of all the evidence specifying the same grounds for relief articulated in the motion for judgment n.o.v. *United States for Use of Roper, IBG, Div. of Roper Corp. v. Reisz,* 718 F.2d 1004, 1007 (11th Cir.1983) (a motion for a directed verdict at the close of plaintiff's case will not suffice unless it is renewed at the close of all the evidence). *Accord Johnson v. Armored Transport of California, Inc.,* 813 F.2d 1041, 1042 (9th Cir.1987); *Baskin v. Hawley,* 807 F.2d 1120 (2d Cir.1986); *Della Grotta v. State of Rhode Island,* 781 F.2d 343, 349–50 (1st Cir.1986); *Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285 (8th Cir. 1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983).

When plaintiffs rested, the court was certain that a motion for directed verdict had no merit and was prepared to deny it summarily. (Tr. 869) "[T]he only purpose for the motion would be to preserve your record. This is done." (*Id.*). At the close of all the evidence, the court reminded counsel for defendants that he would be permitted to make his motion for the record, and that if he wanted "to make

such a record [he] better do so at the present time." (Tr. 1295) Counsel declined to do so because he did not want to take up everyone's time. (*Id.*) The court responded it was not going "to allow anytime," but was merely going to permit counsel to put the motion on the record. (Tr. 1295–96)

■Although technically the present motion for judgment n.o.v. is not properly before the court, *Baskin v. Hawley, supra,* the circumstances of this case are such that failure to make the motion may be excused. At both the close of plaintiffs' case and at the close of all the evidence, the court made clear to counsel that making the motion would constitute a waste of time, that little time would be allowed for argument and that the motion would be denied out of hand. While counsel may be faulted for not putting on the record in summary fashion the arguments made here to support the motion, the court has to bear much of the responsibility for counsel's silence. It would not be fair now to deny the motion on procedural grounds.

Moreover, counsel's failure to make the motion for directed verdict at the appropriate time has not prejudiced the plaintiffs. All the reasons stated in support of the motion, except the one relating to Mr. Fleming's closing argument, were voiced during the trial. Thus, defendants' position comes as no surprise. Plaintiffs have been firmly convinced throughout of the appropriateness of their own theory, so that it is doubtful that they would have amended or modified their position as a result of defendants' arguments. There are circumstances where strict application of the rule should not apply. *See McKinnon v. Berwyn,* 750 F.2d 1383 (7th Cir. 1984); *Bonner v. Coughlin,* 657 F.2d 931 (7th Cir.1981); *Pittsburgh–Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572 (7th Cir.1976). *See also Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812, 813 (2d Cir.1984) (citing cases). This case presents such circumstances. We therefore proceed to the merits.

In this circuit the rule is that judgments n.o.v. may be granted when "the evidence is such that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970) That rule has been reaffirmed again and again. *See e.g. Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163 (2d Cir.1980); *Konik v. Champlain Valley Physicians Hospital Medical Center,* 733 F.2d 1007 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Unijax, Inc. v. Champion International, Inc.,* 516 F.Supp. 941 (S.D.N.Y. 1981) (Carter, J.), *aff'd,* 683 F.2d 678 (2d Cir.1982). In considering the motion, the evidence must be viewed in the light most favorable to the non-moving party. The motion "will be granted only if (1) there is a complete absence of probative evidence to support the verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.) (citations omitted), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970); *Noonan v. Midland Capital Corp.,* 453 F.2d 459 (2d Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972).

■ Witness credibility, however, was a crucial factor in this case, and the evidence does not meet the applicable yardstick of being overwhelmingly in favor of the movant. Accordingly, the motion for judgment n.o.v. must be denied.

■ Denial of the motion for judgment n.o.v., however, does not preclude consideration of the motion for a new trial. *Anglo–American General Agents v. Jackson Nat. Life Ins. Co.,* 83 F.R.D. 41 (N.D.Cal.1979). We will, therefore, discuss the issues raised to determine whether a new trial is warranted.

Defendants contend that Kenneth McGraw's testimony as to the fair market value of RIF was speculative and not of sufficient certainty to sustain the award,

citing *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 463, 467 (7th Cir.1968), and an opinion of this court. *Shatkin v. McDonnell Douglas Corp.*, 565 F.Supp. 93, 95 (S.D.N.Y.1983) (Pollack, J.).

Mr. McGraw's qualifications as an expert in valuation of business enterprises were never challenged by defendants (Tr. 770). Nor was there objection or a request to examine McGraw on *voir dire* when he stated that his assignment was to determine the fair market value of RIF as of March 31, 1983 (Tr. 774). The exhibits and charts McGraw prepared to illustrate and summarize his testimony were offered and admitted without objection (Tr. 801). He was subjected to extensive cross-examination (Tr. 806–860), with particular emphasis placed on the sources of his information. (Tr. 806)

McGraw testified clearly and lucidly as to the bases for his various conclusions. His projections were based on the history of RIF's operations, which had been made part of the record through Lamborn's and Dittmer's testimony, the financial records of RIF, industry-wide data and trends which he specifically identified, and expectations of Lamborn and Maringer which he said were consistent with his own analysis. There was no objection that any of McGraw's testimony was grounded on speculation derived from inadmissible evidence or was at odds with testimony admitted in the record. Defendants sought merely to challenge McGraw's conclusions and to undercut his testimony on cross-examination, as well as through the testimony of their own expert, Samuel Seidman, who testified, in contradiction, that RIF as of March, 1983 had a fair market value of zero dollars. Indeed, defendants' counsel led Seidman through McGraw's testimony and elicited disagreement from him with every one of McGraw's conclusions about RIF's worth and potential. Seidman characterized McGraw's mathematical projections as "a statistical exercise that has no meaning in reality." (Tr. 1171) The jury was not manipulated by unsupported assumptions, as was the case in *Shatkin v. McDonnell Douglas Corp.*, 565 F.Supp. 93, 95 (S.D.N.Y.1983) (Pollack, J.) (Rule 703,

Fed.R.Evid., does not permit a witness "to base his opinions on assumptions and data that are so contrary to the evidence in the record or on assumptions that are so speculative that they amount to gross conjecture and nothing more").

■ At the close of the testimony, the jury had before it two dramatically opposed views of RIF's fair market value as of March, 1983 and 1987. While the jury could have accepted Seidman's analysis that RIF was worthless, it instead found McGraw's testimony more persuasive and awarded plaintiffs' substantial damages. That, however, is the inherent risk of every litigant. The jury may have been persuaded to accept McGraw's formulation because counsel for plaintiffs secured a concession from Seidman that the record showed a steady lowering of RIF's general and administrative costs, accompanied by a steady increase in purchase and sales transactions and commission income, which indicated that with a 45 percent reduction in clearing charges by Refco, Inc., RIF could show over a 15–month period a profit of $6 million. (Tr. 1223–1250) Counsel for defendants were not able to get McGraw to concede that the trend in RIF in terms of growth and profitability was anything other than upward subsequent to its start up phase, while Lamborn and Maringer were at the helm. At any rate, it is no basis for a new trial that a jury accepts one party's theory of damages over the other's.

Defendants argue that McGraw's statistically-derived projection of revenues was improper, and so Seidman contended, but there is no legal imperfection in McGraw's use of statistics. He founded his statistics on financial data in the record. Defendants had ample opportunity to persuade the jury that the McGraw analysis was wrong, but failed to do so.

Plaintiffs secured support for McGraw's 1983 value analysis from Seidman on cross-examination and for McGraw's 1987 valuation from Philip Bennett. (Tr. 1062–64) McGraw's analysis in both instances was derived from financial statements of defendants.

■ The complaint about plaintiffs' counsel's prejudicial appeal to passion is totally without merit. Counsel did say that "the case is about a man, Thomas Dittmer, who testified to great resources, his own great resources". (Tr. 1395) He also said "Dittmer, a man of great resources, put in the money." (Tr. 1396) He also said, "[y]ou may find that Dittmer, with all of his resources, all of his power, believed Lamborn and Maringer would take their lumps and go away." (Tr. 1398) Subsequently he told the jury, "[t]his is a case about raw power, and the dishonest use of power and the unfair use of power and money." (Tr. 1414) He referred to the defendants' takeover of RIF as a coup d'etat (Tr. 1411, 1416), and to Dittmer as "owner of the Cadillac of the business. He does not drive the Cadillac. He sits in the back seat." (T. 1419) At another point he referred to Dittmer sending one of his "three private airplanes to New York" to pick up "eight or ten of the best salesmen to fly them to Chicago to Dittmer's house." (Tr. 1412–13) None of these statements was improper.

The closing argument was not interrupted by objections from defendants, nor were objections made to the court at its conclusion after the jury had been excused. Ordinarily, contemporaneous objections must be made for such to be preserved, *Gonzalez v. Volvo of America Corp.*, 734 F.2d 1221 (7th Cir.1984), unless there is plain prejudicial error. *Rothschild v. Drake Hotel, Inc.*, 397 F.2d 419, 425 (7th Cir.1968); *Lange v. Schultz*, 627 F.2d 122, 127 (8th Cir.1980); *Sadowski v. Bombardier, Ltd.*, 539 F.2d 615, 618 (7th Cir.1976).

■ The references to "raw power" and "coup d'etat" surely constitute fair comment. The remark about "the Cadillac of business" is a slight misquote of Seidman's testimony referring to Dittmer as "the Cadillac of the industry," (Tr. 1175–76), and the statement that Dittmer sits in the back seat is, of course, a sarcastic reference to Dittmer's operational style. Surely the use of sarcasm by counsel in argument is not barred. The argument was not marred by crudeness, coarseness,

slander or personal epithets directed against defendants, which were found objectionable in *Koufakis v. Carvel*, 425 F.2d 892, 905 (2d Cir.1970). The remarks about Dittmer's power and wealth are supported by the record, and these references fall far short of asking the jury to base its decision on the financial disparity between Dittmer and Lamborn—a tactic which was condemned in *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir.1978). The reference to one of Dittmer's three private airplanes picking up people in New York to fly them to Chicago to attend an affair at Dittmer's home was a mere regurgitation of testimony in the record. There can be no valid cause for complaint when an opponent uses trial testimony as part of his closing argument to the jury.

■ The complaint about Fleming's impropriety in giving his own opinion about a witness's credibility is also misplaced. The statement quoted in defendants' brief at page 55 is surely appropriate comment. There counsel is characterizing the claim that Dittmer signed notes without looking at them or knowing what they were as pretextual, false, dishonest, unfair. (Tr. 1425) That Dittmer may have inadvertently signed the notes was emphasized by defendants in answer to plaintiffs' testimony seeking to prove deliberate wrongdoing. Fleming had every right to characterize the defendants' claim the way he did. He was under no obligation to leave the matter without comment and risk that the jury might accept defendants' version of what occurred.

Fleming's comment about Seidman is taken out of context. (Def. Brief at 56) "[V]alid statistical exercise which has no meaning in reality" is a direct quote from Seidman's testimony (Tr. 1171) attacking McGraw's statistical analysis. "These guys are all wrong" (Def. Brief at 56) is also a direct quote from Seidman, who was asserting that Lamborn and Maringer were not up to date with the current trend in futures trading but were in the "dying end of the business." (Tr. 1152) Fleming was again resorting to sarcasm and being perhaps a bit self-congratulatory for skillful

**118**

cross-examination by which he had undermined the foundation of some of Seidman's disparaging remarks about Lamborn and Maringer. The statement that Seidman knew everything except he did not know anything constituted fair comment. "He would say anything that man" may be borderline, but assuming that it is, that single statement is not enough to justify a new trial.

■ The complaint about the innocuous statement that Lamborn and Maringer believed in what they had done, etc., and "that's why we are here and we represent them" (Tr. 1398) (Def. Brief at 57) stretches Disciplinary Rule 7–106(C)(4) to the breaking point. A parsing of the statement makes clear that no ethical constraints were breached. The first phrase "they believed in what they did" refers to the plaintiffs. The "we" in "that's why we are here" refers to court, jury, counsel and defendants being present at trial. Only in the "we" in the phrase and "we represent them" is counsel referring to himself and his law firm. Counsel was not expressing to the jury any personal opinion about the worth of his client's case. He was merely telling the jury that his clients initiated this litigation, which brought everybody into court, because the clients believed in their case.

As was pointed out in *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir.1980), in determining whether a jury verdict has been influenced by improper conduct warranting a new trial, "a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." *Id.* at 756. Where a lawyer's comments have been held sufficient to warrant a new trial, the improprieties have formed persistent patterns of misconduct. *Id.* at 758. There was nothing even remotely similar to such misconduct in plaintiffs' counsel's closing argument.

■ The claim of prejudice concerning Stoller has no merit. On May 8, 1985, the court denied the motion to disqualify the Curtis Mallet firm because it was the court's conviction that any evidence defendants deemed relevant concerning Stoller's participation in the negotiations between Lamborn, Maringer and Dittmer was readily available through the testimony of other witnesses. Lamborn's lawyer could have been called, as could Dittmer's lawyer at the time, and if any defendant employee was present during the negotiations, that person could also have been called. Defendants chose not to avail themselves of any of these alternatives. The court remains satisfied that defendants had not shown a sufficient basis to warrant disqualification of Stoller and his firm. Having made that ruling, it was certainly proper to bar comment by defendants about Stoller's role in argument or through leading and suggestive questions put to witnesses. That did not prevent defendants from eliciting direct testimony from witnesses as to what role Stoller had played in the negotiations. (Tr. 233–34) Defendants would have been allowed to refresh the witness' recollection by reference to Stoller's pretrial testimony (Tr. 407–408), but defendants wanted nothing less than calling Stoller to the stand to question him.

To complain that Stoller was asked to read from the witness stand the responses of a deponent is absurd, particularly when, again, there was no objection by defendants to his doing so. (Tr. 508)

■ And the complaint about the admission of evidence concerning the promissory notes has even less merit. The notes and plaintiffs' evidentiary proof designed to show that the notes were false and that defendants had wrongfully dissolved the partnership could not have been excluded by the court. Defendants were on notice early enough to enable them to counter the plaintiffs' theory. Instead, they opted to cry foul. The defendants claim that they were denied sufficient discovery on the issue of the notes. But what is there to discover? Defendants knew a month before trial that plaintiffs would claim that

there were not the requisite forty percent losses in the partnership to warrant its dissolution by Dittmer. (Def. Brief at 80) Defendants also knew roughly a week before trial that plaintiffs were prepared to show the falsity of the notes through an expert. Defendants had the opportunity to counter this testimony with their own expert, but again chose not to do so.

Finally, defendants argue that plaintiffs should not have been allowed to introduce a document that labeled the clearing charges Refco, Inc. charged RIF, Inc. as overcharges. Defendants now argue that they were not permitted to introduce evidence on clearing fees. (Def. Brief at 101 *et seq.*) Defendants discussed the question of clearing fees with Bennett on his direct examination and introduced a chart which Bennett explained to the jury (Tr. 973–980), purporting to show the reasonableness of the clearing fees assessed by Refco. After cross-examination, they were again allowed to query Bennett on the subject of the clearing fees charged (Tr. 1079–80), and the testimony was cut off by the court only when it appeared to be moving beyond proper redirect examination. The basic problem, however, was that the jury apparently concluded that plaintiffs' assessment of the fees as excessive was correct.

 Plaintiffs' post RIF earnings are irrelevant. This litigation was for damages based on the value of the business which plaintiffs claimed was wrongfully taken from them. What they may have earned since being terminated at RIF in no way diminishes the damages they are entitled to receive based on the worth of the business plaintiffs had established.

Defendants have presented no basis on which the court should grant their motion for a new trial. Accordingly, the motion is denied in all respects.

IT IS SO ORDERED.